Gayla MOORE, Respondent,

v.

Edith C. MOORE, Appellant.

No. 27804.

Missouri Court of Appeals, Kansas City District.

Nov. 29, 1976.

Robison & Miller, Maysville, for appellant.

Richard G. Poland, Cameron, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Action for damages for wrongful foreclosure of deed of trust. Jury in trial court found for plaintiff and awarded her $2,104 actual damages and $7,500 punitive damages. Defendant has appealed.

In 1969, Charles R. Moore and his wife, Gayla Moore, became interested in purchasing a residence in Cameron, Missouri. Charles's grandmother, Edith C. Stokes (now Moore), defendant-appellant herein, purchased the house and sold it to Charles and Gayla for $23,000. Mrs. Stokes took a purchase money deed of trust for the entire purchase price. The Moores executed two notes, secured by the deed of trust, dated May 21, 1969, one for $15,000 and the other $8,000. The $15,000 note was to be repaid in monthly payments of $62.50 plus accrued interest at 5%, beginning August 1, 1969. The $8,000 note was made payable at the rate of $34.80 per month.

Receipts produced at the trial indicate that payments were made to Mrs. Stokes as agreed until around June 1, 1970, when principal payments were omitted and interest only was paid through January, 1972.

At sometime Mrs. Stokes endorsed the $15,000 note to her grandson, Charles Moore, and she endorsed the $8,000 note to her daughter, Juanita Uthe, the mother of Charles. Beginning February 1, 1972 payments of $50 per month were made to Mrs. Uthe. Receipts showed that the payments were applied against the principal of the

$8,000 indebtedness. The last receipt, dated September 1, 1973, showed a balance due on the indebtedness of $7,000. According to Mrs. Stokes she never delivered the notes to the endorsees. She kept them in her possession but did authorize the payments to be made to Mrs. Uthe. As best can be understood from Mrs. Stokes's not too clear explanation of the transaction, she wished to help her grandchildren and she had aided another grandson in purchasing a house. Her idea in endorsing the notes and keeping them was to retain control over them as long as she lived, with the endorsees becoming entitled to them upon her death.

Charles and Gayla encountered financial and marital difficulties. In September, 1973, Charles left the family home and went to live with his mother. After the separation Charles spoke to Gayla about "signing the house back" to his grandmother, saying that they could not pay for it and it did not belong to them anymore. Gayla declined to execute a quitclaim deed.

Sometime after the separation, Mrs. Moore, Charles and Mrs. Uthe met in Mr. Miller's law office. Charles endorsed the $15,000 note back to his grandmother. Mrs. Uthe endorsed the $8,000 note back to her mother.

On October 17, 1973, Mr. Miller, the trustee under the deed of trust, wrote Charles and Gayla and informed them that he had been requested to enforce collection of the notes or proceed with foreclosure. His letter stated that the balance due on the $15,000 note was $15,254.15 and on the $8,000 note, $9,200. Gayla made no response to the letter.

In November, 1973, publication of notice of trustee's sale was begun. Because the trust deed had erroneously described the property as being located in DeKalb rather than Clinton County, notices were published in both counties and on December 14, 1973, a trustee's sale was held at the courthouse in both counties and Mrs. Moore bid in the property for $15,000.

In January, 1974, Charles filed proceedings for dissolution of his marriage to Gay-

la. The marriage was dissolved and as a part of the property settlement or division Gayla received whatever interest the couple had in the residence in question.

In April, 1974, Mrs. Moore filed an action against Gayla to recover possession of the property. Possession was delivered to appellant on June 18, 1974.

On June 6, 1974, Gayla began this action. Her petition was in two counts. By Count I she sought to set aside the foreclosure for defects in the foreclosure proceedings. Count II alleged that the foreclosure was the product of a conspiracy between her husband and the defendant "to deny the plaintiff of her marital rights in and to the residential property * * *." The petition charged that the foreclosure was wrongful "in that a demand was made of plaintiff vastly in excess of the amount of indebtedness, if any, in furtherance of an illegal conspiracy to deny this plaintiff her marital rights in the property * * *." The petition asked for $20,000 pecuniary damages, $20,000 for mental anguish and $50,000 punitive damages.

The defendant's answer asserted the validity of the foreclosure and relied upon plaintiff's failure to give notice of intention to redeem or to tender the amount due on the notes. It denied generally the allegations of the petition. Defendant also counterclaimed for rent from the date of the foreclosure.

At the trial, plaintiff testified and called Charles, his mother and the defendant as adverse witnesses. The defendant offered no testimony. At the close of the evidence, defendant moved for a directed verdict on the grounds that recovery by plaintiff could be allowed only upon a showing that the foreclosure sale was void and that no such showing had been made. The motion was overruled.

Plaintiff then submitted the issues under Count II, with her principal instruction stating her theory of recovery as follows:

"Your verdict must be for the plaintiff Gayla Moore on her petition if you believe:

"First, that defendant knowingly demanded of plaintiff a sum of money far in excess of the actual indebtedness.

"Second, that such demand by defendant was in furtherance of a scheme to deny the plaintiff of her marital property rights.

"Third, that the note or notes necessary to disprove defendant's demand were in control of defendant or those acting for her.

"Fourth, that from January 1972 until September 1, 1973, defendant led plaintiff to believe that no payment was due on the $15,000.00 and that plaintiff relied on said belief.

"Fifth, if you believe the plaintiff was damaged thereby."

The jury returned a verdict for plaintiff of $2,104 actual damages and $7,500 punitive damages and found for plaintiff on defendant's counterclaim. By a post-trial order the court sought to reduce the amount of punitive damages by remittitur of $3,000. Appellant acknowledges that the order was not timely filed.

On this appeal, appellant first contends that the trial court should have sustained her motion for directed verdict because plaintiff's cause of action for damages was a collateral attack on the trustee's sale, permissible only when the foreclosure is void because no right to sell existed, and plaintiff proved only, at best, a sale voidable because of irregularities.

In *Spires v. Lawless*, 493 S.W.2d 65, 71–72[8] (Mo.App.1973), the Springfield Court of Appeals made the following apropos statement regarding the law in this area in Missouri:

"Recovery for wrongful foreclosure has been allowed in such widely varying circumstances that it is doubtful that any single theory of recovery is applicable to every case which has been called an 'action for wrongful foreclosure'. The best that can be said is that the authorities cannot be fully reconciled, and an examination of the topically collated cases to discover the true basis of legal liability in such actions obscures as much as it clarifies. In this jurisdiction, our Supreme Court, in *Peterson*,

supra, [*Peterson v. Kansas City Life Ins. Co.,* 339 Mo. 700, 98 S.W.2d 770], carefully distinguished those 'wrongful foreclosure' cases which are really actions based on active fraud or fraudulent conspiracy, e.g. *Stansberry v. McDowell,* Mo.App., 186 S.W. 757, from cases like *Missouri Real Estate Syndicate v. Sims,* 179 Mo. 679, 78 S.W. 1006, subsequent appeal 121 Mo.App. 156, 98 S.W. 783, and *Rogers v. Barnes,* 169 Mass. 179, 47 N.E. 602, 38 L.R.A. 145, and held, as we read the case, that an action at law for damages for wrongful foreclosure can be maintained against the mortgagee only when the sale is absolutely void because the mortgagee had no right to foreclose at the time foreclosure proceedings were commenced. *Peterson,* supra, 339 Mo. at 706–708, 98 S.W.2d at 774–775[4]; 108 A.L.R. at 588–589. See also *Loeb v. Dowling,* 349 Mo. 674, 679, 162 S.W.2d 875, 877[1, 2]."

In *Peterson v. Kansas City Life Ins. Co.,* 339 Mo. 700, 98 S.W.2d 770 (1936), the court stated (98 S.W.2d 773–774):

"The fatal defect in plaintiff's case is that, while she seeks to recover damages on the theory that she lost her equity of redemption in the land by a wrongful foreclosure by the mortgagee, her proof shows that defendant had a right to foreclose under the terms of the trust deed because of her defaults. A mortgagee's act of commencing a foreclosure cannot be wrongful when there is a clear right to foreclose. See *Hayward Farms Co. v. Union Savings Bank & Trust Co.,* 194 Minn. 473, 260 N.W. 868. The most that plaintiff's evidence tends to show is not a wrongful foreclosure by the mortgagee, but only an improper execution of a rightful foreclosure. The cases of *Missouri Real Estate Syndicate v. Sims,* 179 Mo. 679, 78 S.W. 1006; 121 Mo. App. 156, 98 S.W. 783, and *Rogers v. Barnes,* 169 Mass. 179, 47 N.E. 602, 38 L.R.A. 145, upon which plaintiff relies are true cases of wrongful foreclosure by the mortgagee. In the *Real Estate Syndicate* Case, the mortgagee had no right to foreclose because he had made a valid extension agreement. In the *Rogers* Case, the mort-

gagee had no right to foreclose because there was no default. The case of *Stansberry v. McDowell* (Mo.App.) 186 S.W. 757, also cited by plaintiff, was not a true case of wrongful foreclosure, because the obligation secured had matured as the court there recognized; but there the cause of action was based on a fraudulent conspiracy to conceal the note and accomplish foreclosure without plaintiff's knowledge, in face of plaintiff's active efforts, made known to defendants, to find the note and prevent foreclosure by paying it. The right to recover there was neither based on wrongful foreclosure nor improper execution of a foreclosure but for acts of active fraud which caused damage. It has no resemblance to this case. *Sherwood v. Saxton,* 63 Mo. 78, was an action against a trustee for wrongfully releasing responsible bidders who had purchased at a proper foreclosure sale, and then selling at a second sale for less money. Of course, this caused a loss to the mortgagor and there was a definite basis for computing his damages."

Respondent does not here directly assert that the foreclosure sale was void. Her response to appellant's argument is that in *Edwards v. Smith,* 322 S.W.2d 770 (Mo. 1959), the Supreme Court authorized direct action at law against the mortgagee for wrongful foreclosure. *Edwards v. Smith* did recognize the distinction pointed out in *Peterson v. Kansas City Life,* supra. In permitting the cause of action for damages, the court pointed out (322 S.W.2d 776):

"Assuming, for the purposes of this opinion, that the Smiths, in the manner heretofore discussed, waived the right to insist upon prompt payment of the installments, then they did not have the right to foreclose at the time they directed the trustee to do so and hence the trustee's sale would constitute a wrongful foreclosure. In that situation plaintiffs could have brought a suit in equity to set aside the sale, or, let the sale stand and sue at law for damages."

In the *Edwards* case, the mortgage called for $15 monthly payments. The court held that testimony that the mortgagee had agreed to accept multiple payments irregu-

larly, based upon the mortgagor's receipt of bonus compensation from his employment, and had received, without objection, payments on such basis, should have been received as tending to prove that the mortgagee "by words and conduct, had induced the plaintiffs to believe that the method of payment they had adopted would not result in foreclosure. The theory is that the agreement would constitute a waiver or estoppel to invoke the acceleration clause until after the mortgagee has given reasonable notice that he will no longer be bound by his gratuitous agreement."

In *Edwards*, when four monthly payments were unpaid, foreclosure was begun without notice to the mortgagor. When the mortgagor received notice of the pending foreclosure, he immediately got in touch with the mortgagee and sought to pay the delinquent payments, but payment was refused by the mortgagee.

█ The *Edwards* case is distinguishable on its facts from this case. Respondent admits that she received the demand for payment of the full amount of the notes. She admits that she was notified of the foreclosure sale before it took place. She did not question the right of the appellant to invoke the acceleration clause in the notes. She acknowledged that payments had not been made as called for. She did question the amount appellant's demand called for but not before the foreclosure. Respondent has not brought herself within the *Edwards* case because she did not show the prerequisite absence of a right to foreclose.

Although respondent has not cited the case of *Stansberry v. McDowell*, 186 S.W. 757 (Mo.App.1916), the allegations of her petition evidence an attempt to state a claim akin to that involved in *Stansberry* of fraudulent conspiracy. She alleged a demand in excess of the amounts due on the notes and an unsuccessful effort to obtain production of the notes in order to ascertain the amount of the actual indebtedness. However, she offered no evidence in support of the latter allegation. In *Stansberry,* the mortgagor proved that the defend-

ants "concealed the note when they knew plaintiffs were seeking it, and this they did for the sole purpose of realizing a profit, which in all probability they would not have made if plaintiffs had known of the whereabouts of the note or of the date of the foreclosure sale." 186 S.W. 759.

At the trial here, plaintiff produced receipts and cancelled checks which provided the basis of her contention, submitted in her Instruction No. 4, that the sum of $21,-542.76 was "the valid existing lien or mortgage against said property." Some of the checks were drawn by plaintiff-respondent. Her former husband testified that plaintiff "generally took care of that stuff. She wrote the checks and made our (sic) the bills, you know."

█ Respondent's ultimate reliance would have to be of a "fraudulent conspiracy to defraud her of her marital rights in the property." This basically is premised upon the fact that until her marital difficulties with the mortgagee's grandson, the mortgagee had been content to ignore the failure to make payments on the note as agreed upon. However, the motive which prompted the demand for payment of the notes and the ultimate foreclosure is immaterial insofar as this action is concerned if the right to foreclose did exist, *Owens v. Owens*, 347 Mo. 80, 146 S.W.2d 569, 577[7–9] (1940). Respondent did not disprove the existence of such right. Therefore, the motive for the foreclosure provides no basis for a claim of fraud.

In conclusion, this case is controlled by the rule laid down in *Peterson v. Kansas City Life Ins. Co.,* supra. The trial court should have sustained appellant's motion for directed verdict.

Judgment reversed.

All concur.